Good morning, Your Honor. Larry King on behalf of Appellant Dr. Van Pena. This is a First Amendment case in which there are a number of issues that have been identified for appeal. The first issue has to do with the district court's determination that a memo that my client personally gave to his supervisor, the medical director at the Sonoma Developmental Center, apprising her of a serious act of malpractice. The court ruled that that was not protected by the First Amendment because she claimed it was issued within the scope of his employment. At this point, I'd like to direct the court's attention to the appellee's April 12, 2011 letter with supplemental authorities and apprise the court that one of those authorities, the Hooper decision, Judge Fletcher, in that decision admonishes district courts to be wary of making that kind of decision on summary judgment and summarizes what were then the four leading cases of this circuit since the Garcetti decision about when speech is issued within the scope of the employee's job duties. Counsel, if I could ask you a question. Wasn't it his duty to comment on the care given this particular patient? No, it was not, Your Honor. That was something that he did voluntarily and that was confirmed at trial by Dr. Bjorndal, the appellee herself, as well as Timothy Meeker, the executive director of SDC. What they explained at trial... Why would he not have a duty to comment in his job about improper medicine given to a patient if that patient was somehow one he was reviewing? He was not the treating physician for that patient, Your Honor, nor was he the quality control officer. This is something that came to his attention as a medical officer of the day as a further example of malpractice and patient abuse occurring at this institution. Dr. Bjorndal herself... A medical officer of the day doesn't have a duty to report maltreatment of an individual? At the Sonoma Developmental Center, they had a system for reporting abuse and maltreatment. That's different. That's a question of whether he had a duty to report it or a different question of how was he to execute that duty. Well, Your Honor, I would suggest given the trial testimony of Dr. Bjorndal, who herself said he had no duty to bring her that memo or bring this to her attention directly. As I said, these are two different questions. Judge Gould asked whether he had a duty to report the episode of maltreatment in his capacity as officer of the day. You're answering that question by saying he didn't have a duty to give it to the particular woman he gave it to. I think in each case we have to look at, and this is what the Supreme Court said, you have to look at the circumstances of that work environment to determine what the duty is. And in this particular environment, he had a duty to file a special incident report. He did not have a duty, and this goes to your decision in Freetag as well, did the officer in that case have a duty to report up the chain of command to the director the sexual harassment to which he would be subjected? You remanded that for consider factual determination at the district court level. This case, in Freetag, you found that that individual who filled out a specific form that they were required to fill out concerning their complaints, that that was action taken within the scope of their duties and therefore was not protected. But you said it was a much closer question as to when that same officer reported it to the director whether she was in fact required to do that. What the evidence in this case shows is that my client was not required as part of his job duties to provide this memo to the medical director. The medical director herself at trial admitted that he was not required to do that. Counsel, if he had filled out the standard form, would that have been within his duties? That would not be protected under the Freetag decision, and I would agree it would not be protected. If he had filled out that standard form, would it have gone to the medical director? Not directly. Would she have received the copy? No, in fact, it would have gone... You just said not directly. Now, is it not directly, or no, it would not have gone to her? In the normal course, it was not directed to her. It would go to the quality control officer. There would be several steps taken. I'm not trying to submit that in certain cases it might not come to the medical director's attention, but the point is he stepped out of the scope of his employment to take this, as in Freetag, to a higher level that he was not required to take it to, and that's supported by the testimony of both the executive director and the medical director, contrary to what the medical director said at the time of summary judgment. And what the four cases that Justice Fletcher identified in the Robinson case, or the Hubert case, that neither my colleague nor myself brought to your attention, but I think are dispositive in this case concerning the summary judgment issue, is that whether or not that came within the scope of his employment was a question of fact, and that it must be reserved, and this is a quote, until after the fact-finding process. And it was in this context that Judge Fletcher pointed out that the district court makes that kind of decision at their risk at the summary judgment level, and this case is a perfect example, because at the summary judgment level, you had Dr. Pena saying, no, under the system established at SDC, I was required to fill out these forms, and it was to go to the quality control officer. I did that repeatedly, and nothing happened. Therefore, like in Freetag, I took it to a higher level that I was not required to do as part of my job, and because in the past nothing was being done about these reports. And at trial, both Appellant Bjorndal and Tim Meeker, the executive director, testified under oath that he was correct, that he was not required as part of his job to prepare and deliver this memo to the medical director, that doing that was beyond the scope of his job, something he did for his own personal, political, or social, or ethical reasons, but it was required by no policy, or procedure, or rule at the institution. Moving on to the... Let me ask you this. Do you then take the position that there is a tribal issue material fact as to whether your client acted as a citizen or an employee when he sent the memorandum? That's true. That was the position we took in our briefs, and we supported it then, both with his declaration, which created the tribal issue at the summary judgment level, and then we also in our briefs supported it with the trial testimony of Bjorndal and Meeker, which confirmed that the position he took at summary judgment was correct. And that is why the judge should not have, faced with the dispute between his version of what the scope of his employment was and Bjorndal's version at summary judgment, she should not have decided that issue. In Posey, this circuit has made clear when there's that kind of conflict, because this whole issue of scope of employment is a factual question, and then if it's within the scope of employment, then the legal determination is made that it's not protected, that the district court has to wait until the completion of the fact-finding process, and that's what she did not do in this case. She jumped the gun, and the trial testimony shows that she did so in error. The next issue that I would like to address, unless the court has questions on the first issue, is her grant of summary judgment concerning my client's report to an outside agency, the Department of Health Services, that licenses the Sonoma Developmental Center. There, Dr. Bjorndal said she could not recall being told about his complaint to the outside agency. The person involved said she did not recall that Dr. Bjorndal was involved in it, and the judge pointed out in her order that these complaints are done anonymously. And based on those three factors, she said that Dr. Bjorndal could not have known. What she failed to consider was the substantial circumstantial evidence, and this is a problem with a couple issues in this case. She does not appear to give any weight to circumstantial evidence. The circumstantial evidence from which a jury could conclude that, these following things happened. On October 18th, the outside agency issued a report that went both to my client and to the agency, finding that his report that photographs of patient injuries were being removed from patient records, validating his complaint and requiring the agency to take corrective action. On October 25th, just one week later, Dr. Bjorndal testified that there was an executive staff meeting which she and Meeker both attended, in which there was, her words, a big brouhaha about how Dr. Pena was taking photographs of patients. She discussed this matter with Meeker, who was a defendant in this lawsuit at the time. Bjorndal was not yet, because she hadn't fired him yet. Discussed it with Mr. Meeker and decided that she should go down and tell my client to stop taking photographs of patients. In addition, Meeker had, prior to that, in response to the agency's finding of a violation, issued a directive to all heads of departments, which would include Dr. Bjorndal, concerning that complaint. It's our contention that those circumstantial evidence, the timing, one week before she tells him to stop taking photographs, the fact that everybody's talking about he's the one taking the photographs, discussing it with Meeker, who was a defendant in the lawsuit, and who had previously told the police chief to go out and find dirt that he could use to fire my client, and the fact that he had issued this correction, new policy, specifically related to this complaint, that from all of that, the jury could say, well, wait a minute, she may not nine years later now recall, but at the time, it's clear she would have known from the executive director, from the comments made in the meeting that it was Pena taking the photographs, and that it came just one week after. Can you just explain, the report from the agency that required corrective action, that related to the photographs? Yes, he had... He complained that photographs were being removed from the file? From patient's records, yes. And they came in and did an investigation and found, and it says this in the reports, there would be references to see photograph below, and then below there would be a big empty space. And they said that once photographs were put in the file, they could not be removed? They couldn't be willy-nilly removed. They had to go through a procedure that properly documented it, and so the director then issued a new policy, but in the meantime, But was there a... Lorndahl comes down and tells them to stop taking photographs, and that there is another policy that's in the record that says photograph, you must take photographs of suspicious injuries, that's what he was doing, that's what was being removed. Well, do you want to save your last minute for rebuttal? I do believe we were down for 15 minutes, Your Honor, we had the two stars on our thing. Is that clock incorrect? You've had 15 minutes, it seems. Oh, my gosh. I didn't... We'll give you two minutes for rebuttal. Okay, thank you, Your Honor. Are you leaving? Good morning, Your Honors. May it please the Court, my name is Terry Sanney, and I represent the defendant and the appellee, Dr. Judith Bjørndahl, in this matter. Let me turn first, with your permission, to the Garcetti issue. I think it could not be more clear that when Dr. Peña wrote his February 21st memo to Dr. Bjørndahl, he was acting pursuant to the very core of his most important responsibilities as a medical officer of the day and an attending physician at a residential hospital for the developmentally disabled. It cannot seriously be questioned that in California every physician, and particularly a physician who works at an institution such as Sonoma Developmental Center, has a primary obligation to report every single instance in which he or she observes what he thinks or she thinks may be a case of abuse, neglect, or mistreatment of a patient. Nor can there be any doubt whatsoever that that is exactly what Dr. Peña was doing when he submitted his February 21st memorandum to Dr. Bjørndahl. That memorandum, with which I'm sure you're well acquainted, generally describes the circumstances of a patient, her deterioration in terms of a brain hemorrhage and subsequent seizures, and raises a concern that the medications that she had been administered might have contributed to that deterioration in her condition. What could be more central and basic to the duties of a physician who is employed at this particular institution? Nor are there any genuine issues of disputed material fact. Are you familiar with the case that counsel referred to in the letter? He said that it was filed April 11th. Did you receive a copy of that letter? Yes, Your Honor, the Hubbard decision. Are you familiar with that decision? I am. And counsel said it warned about making that kind of determination on summary judgment. Well, there certainly are cases in which there are genuine issues of material fact with regard to that in which summary judgment would be appropriate, but this is not such a case. Let's look specifically at the speech or at the evidence that counsel has contended created those disputes of material fact. The first one is that Dr. Bjorndal testified, quote, that he was not required to bring these things to your attention directly as part of his job, and she agreed with that. Well, that's perfectly consistent with the institution's policies and procedures. The Sonoma Developmental Center abuse, mistreatment, or neglect prevention and reporting policy is in evidence. You'll find it at the supplemental excerpts of record at 257 and then at 261 and 262. And it specifically says that when mistreatment or neglect is suspected, the physician is free to contact and to make a report not just to his supervisor, but if he's uncomfortable with that route, there are a number of different people to whom the report can be submitted. It can be submitted to a staff, to a program director, a program assistant, a nursing coordinator, a department head, the SDC police, a special investigator, quality assurance staff, or a facility administrator. So the fact that Dr. Bjorndal testified that he was not required to submit that directly to her in no way contradicts the fact that he had a responsibility to make this report to some responsible authority. And indeed, that is the way the general policy is stated. At the supplemental excerpts at 257, the policy states, after securing medical attention for the patient, which is, of course, the first thing one would want the doctor to do, staff shall then report the events in question to appropriate authorities. Well, that's exactly what he did. As far as Mr. Meeker's testimony is concerned, which says that if a physician reports on a special incident, he doesn't have any additional obligation to otherwise report it, well, that is also true, but it assumes that's not evidence. There is no evidence in this case that Dr. Pena ever expressed the concerns that were contained in his February 21 memo in any other way. There was not even an offer of proof at trial or in the 10 years of litigation that preceded this trial that he ever made any other form of reporting those particular concerns. But even if there had been, we submit that it would completely emasculate both the spirit and the letter of Garcetti to say that a reporting duty of this magnitude will turn on whether or not one uses a memo, whether one uses a special incident reform report, whether one uses a letter, whether one uses a telephone, or whether one goes and knocks on someone's door and says, there's something really important that we have to tell you here. That surely is of no constitutional significance in determining whether or not the First Amendment protection here should apply. So furthermore, we believe that the appellant is trying to unduly constrain and constrict the natural reach of Garcetti and to apply it only to those deeds which can be shown to have been specifically mandated by the employer. That surely cannot be the case. I would think that it's true and completely fair to say that most employees, certainly most employees in professional positions who are exercising discretion in their work, who are making evaluations and analysis and exercising judgment, are perhaps even most of the time performing tasks that are not strictly and explicitly required by their employer such that if they were stopped in real time and asked, well, is what you're doing right now absolutely required by your employer, the answer would probably in most cases be no. But it in no way follows that those employees are not acting pursuant to their official duties. Dr. Pena was acting pursuant to his official duties, which he described himself not only a function of his employer's policy, but also a function of ordinary ethics and of the regulations of the state of California when he reported the suspected abuse or not abuse really, but mistreatment and malfeasance exercised in connection with this patient. Let me just turn briefly to the Department of Health Services complaint, which was the other summary judgment ruling that the council has addressed. And I think that if one looks carefully at the totality of the record that was before the district court here, it is quite apparent that that evidence did not rise to a level from which any trier of fact could reasonably draw an inference that Dr. Bjørndal was aware of Dr. Pena's report. And the reason that I say that is as follows. First of all, we don't know what the report was. It's never been placed in evidence. The only evidence in the case is that Dr. Bjørndal has no recollection of ever seeing it. Plaintiff presented no evidence that anyone ever told her about it. Well, saying she has no recollection of ever seeing it is somewhat different from saying, no, I never saw it. Yes, it is. But when it's combined with the fact that Mary Giusti, a program analyst, who was intimately familiar with the policies and procedures that surround the handling of those statements of deficiencies, says that she also recalls no involvement of Dr. Bjørndal in it. She knows of no reason why she would have been involved. Well, you say statement of deficiencies. As I understand it, this is a report from the state agency vindicating some complaints. And as a result of the report, the hospital took some actions? Yes. Well, this is not the kind of matter that you think that someone with Mrs. Bjørndal's position would be involved in? Well, not necessarily, certainly. Well, not necessarily, but isn't it an inference that if you were drawing all inferences in the plaintiff's favor, that this is an inference you could draw in the plaintiff's favor? No, Your Honor. I think that one might be able to infer that someone might conceivably have told her about it, but one can't infer that someone actually did and that therefore she knew about it. After all, this was the lowest possible level of citation that the institution could receive. There wasn't even a monetary fine involved. And all that they did in response to this was to the executive director issued a protocol that provided that when materials are removed from the clinical record, there has to be a record made of that so that someone can tell that they've been removed and where they are. The protocol said absolutely nothing about whether or not any particular photographs should have been taken in the first place or by whom. Wasn't it just a week after all that that the defendant told the plaintiff to stop taking photographs? Yes, that's true. She didn't say stop taking photographs. She said stop taking photographs without patient consent because the complaint had been that there were photographs. And this complaint originated from the nursing staff, as Dr. Pena has admitted. There were photographs taken of patients' genitals and they were being placed in the chart and and there was concern that that was violating patient confidentiality. But but please keep in mind the the Department of Health Services citation had nothing to do with whether photographs should be taken. Is it just that if you're going to remove things from the record, you should have a record of it. And that's all that the corrective measure addressed. Well, considering that Dr. Pena was rather controversial at this time with the staff, do you think it's unreasonable to find there was enough circumstances to conclude that she probably was aware, not that she was involved, but she's aware of the complaint and that she was aware of the fact reasonably that Dr. Pena had submitted a ZPH? No, no, Your Honor, we would submit that that is not a reasonable inference to draw, given the fact. I mean, I mean, she's a brand new medical director at that point. This is a very low level citation. And not everything that happens in the institution is immediately brought to the medical director's attention. No one says they brought it to her attention. Her attention. She took no actions and said nothing that betrayed any knowledge of that. Who told her to talk to Dr. Pena a week later about photographs? Yes. And I said, who told her to do that? No one told her to do it, but the complaints came to her attention from the nursing staff. No one, no one's given an order to tell him. Did she testify that the complaints came to her from the nursing staff? Yes, she did. And Dr. Pena also himself testified that that was the original origin of complaints to him about about taking the photographs. And this came to her attention. And she simply went to him and said, well, you shouldn't take photographs without patient consent. That has absolutely nothing to do with the Department of Health Services complaint or its citation or or the executive director's response to that citation. So so I would I would reiterate again, it it might be conceivable that someone could have mentioned it. But that is quite a different thing than saying that that someone can reasonably conclude that she actually knew about it. Moreover, keep in mind that the jury already had specifically concluded that the whole photographing issue was not a motivation for her termination decision. So it's hard. It's hard to imagine how the addition of some inference that she knew about a minor citation could change that analysis, particularly given the extraordinary circumstances that caused him to be fired, having to do with events six months later involving this do not resuscitate order and the very troubling evidence and history that surrounds that surrounds that event. The. I should point out also that that Miss Gusti testified that that this particular citation and not only is the lowest possible violation, but that it involves only minimal relationship to health or safety of residents. And we have a declaration of Jean Decker, who was a supervisor at the Department of Health Services itself. And that was found at the supplemental excerpts of exhibit at 277 and 278, where she said that these complaints are confidential and the complaint, the identity of the complainant is confidential. So even if someone had told her about this citation, there was nothing to connect it with Dr. Pena. Dr. Pena was not the only physician taking photographs at this institution. And I mean, none of these things can be tied together in such a way as to permit any reasonable inference that she knew about it. And and even if she had known about it, it's hard to imagine what difference it would have made in the analysis of this case. Well, you know, I don't have a record here, but three pages cited in which they say that the photographing of patients came up as a big issue in an executive committee meeting at which she was present. Yes. And that was a week after the DHS report of the violations. And it says that there was an executive committee meeting about the taking of photographs a week after that and that she was present at that meeting. Is that correct? It is true that it was a week later that her instruction was given to Dr. Pena to not take photographs without patient consent. And the subject of taking photographs of patients was came up as a big issue at the executive committee meeting. Which he was present. Yes, that's true. But but again, that was not that was not the subject of the DHS citation. The subject was taking them out of the record. And not just it wasn't just photographs. It was it was that they had no written established protocol for removing any materials from clinical records without documentation as to where they had gone. Was there any complaint about anything other than photographs? Anything that indicated in the DHS report that anything other than photographs were being taken out of the records? See, we don't know because we've never seen the complaint. These complaints are confidential. You have the report, don't you? And the report simply complains that there should be a protocol that the report said that there were several clinical records which contained photographs of patient conditions. And the photographs weren't in the record. So so they said, you need to have a protocol for removing materials from clinical records and documentation of that so that you can trace it. And the corrective action that was taken simply said that established a protocol for removing materials from records. I have the impression from what you said earlier that this was such a low level matter that she wouldn't have known about any of these discussions about the report. But it seems she was present at the executive committee where this became a big issue a week before she spoke to Dr. Pena. Well, but the issue was his taking photographs. There's no evidence that it ever became the citation was ever a big issue or the plan of correction was a big issue or that it was ever discussed at all. The big issue was his taking photographs. Dr. Pena. Yes. Well, yes. And not just photographs, but photographs of very private parts and then placing those in the clinical record. And some of the staff felt that this compromised patient confidentiality and privacy. So I'm afraid we've gone way over your time. I apologize. It's not your fault. We kept you busy. Thank you. Thank you. On the summary judgment issue. The core issue is whether you draw this inference or that inference concerning his memo being within the course and scope or concerning the DHS complaint. Those are decisions to be made by the jury. There were facts disputes that should not have been decided on summary judgment. In terms of his memo, counsel would make his duty so broad that any comment he makes about patient abuse or medical malpractice within the agency has no First Amendment protection. What my client did was he began by filing the special incident reports. And in his declaration, contrary to what counsel said, he did it on every occasion, including that occasion. Secondly, when those were not investigated, he went to the police chief at SDC. He went to the special investigator. He then went to the outside agency. He then went to the medical director herself. He then went to the local newspaper. And then he went to the legislature and was involved in getting a statute passed. This is somebody that's crying out in a matter that should be protected by the First Amendment about very serious matters happening to a population that's the most vulnerable population in our society. And given not only... One more sentence. All the time... I have to address one thing. Counsel made a comment about genitals. Dr. Bjorndal herself said none of the photos that he took were inappropriate. The genital one he's talking about was damage done to a genital that looked like somebody had been raped with a broom. That would be an appropriate thing to document so it could be investigated. That's the type of thing that was removed from the records that the DHS came in and said photographs are being removed. The judge's comment about the inference that can be drawn. If it's a big brouhaha in a meeting one week after that report comes out and he says there's no way that Dr. Bjorndal would know it was him, well she's hearing in the executive committee meeting not about anybody else taking photographs but about my client taking photographs. There is one issue that counsel brought up that I would ask the court to let me address if I may. Since we let your opponent go for an extra six minutes, we'll give you another two. Okay. Two. An extra two. Okay. He mentioned the DNR order and I think this is really important. One of the issues on appeal was that she would not give a Coleswater instruction. The instruction that if a jury finds that some of the reasons asserted for the termination are a pretext, they may not require but they may then suspect that the rest of the reasons given are a pretext as well. We put on substantial evidence from which the jury obviously was concerned because they came back with a specific question. Do we have to find all the reasons given for his termination are pretext in order to find in his favor? We requested a Coleswater instruction. The judge refused to give it even though she said that was the correct law. Did you ask for one before the instructions were given? We asked it as a supplemental instruction in light of the jury's question. The answer then is no. Correct. Okay. Thank you. They asked essentially that same question three times and she refused three times and the answer she gave, which is highly prejudicial, was that is not one of the questions you have to answer. My opening statement, my presentation of evidence, my closing statement, given that she had knocked out the DHS complaint and the memo, was focused on showing that the reasons given for his terminations were a pretext. The substantial evidence showing that many of those reasons were, they asked a question directly on that point and she refused to give a clarifying instruction. I would argue that that was a reversible error. Thank you. Thank you, counsel. Thank you both very much. The case just argued will be submitted and the court will take a brief recess for the morning. Not for the entire morning, a brief morning recess.
judges: Timlin, Reinhardt, Gould